IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DARRYL MERCER,                      )
                                    )
              Plaintiff,            )
                                    )
       v.                           )  Case No.
                                    )  07-3305-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
              Defendant.            )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Darryl Mercer seeks review of the final decision
of the Commissioner of Social Security denying plaintiff's
application for disability benefits under Titles II and XVI of
the Social Security Act ("the Act").  Plaintiff argues that (1)
the Administrative Law Judge ("ALJ") failed to indicate what
evidence she relied on in formulating plaintiff's residual
functional capacity, and (2) the ALJ improperly evaluated
plaintiff's credibility.  I find that the substantial evidence in
the record as a whole supports the ALJ's finding that plaintiff
is not disabled.  Therefore, plaintiff's motion for summary
judgment will be denied and the decision of the Commissioner will
be affirmed.

### I.    BACKGROUND

On March 1, 2005, plaintiff applied for disability benefits
alleging that he had been disabled since January 1, 2002.[1]

---

[1]During the administrative hearing, plaintiff's alleged
onset date was amended to February 10, 2005, which was the day

Plaintiff's disability stems from right eye blindness and depression. Plaintiff's application was denied on April 21, 2005. On December 21, 2006, a hearing was held before an Administrative Law Judge. On February 9, 2007, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On July 24, 2007, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera

---

after the final unfavorable decision in his previous application for benefits (Tr. at 494).

2

Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past

3

relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. <u>Nevland v. Apfel</u>, 204 F.3d 853, 857 (8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

    1.  Is the claimant performing substantial gainful
activity?

                Yes = not disabled.
                No = go to next step.

    2.  Does the claimant have a severe impairment or a
combination of impairments which significantly limits his ability
to do basic work activities?

                No = not disabled.
                Yes = go to next step.

    3.  Does the impairment meet or equal a listed impairment
in Appendix 1?

                Yes = disabled.
                No = go to next step.

4.   Does the impairment prevent the claimant from doing
past relevant work?

                No = not disabled.
                Yes =  go to next step where burden shifts to Com-
missioner.

        5.   Does the impairment prevent the claimant from doing any
other work?

                Yes = disabled.
                No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff and

vocational expert Michael Lala, in addition to documentary

evidence admitted at the hearing.

### A.   *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following

income from 1977 through 2004:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1977 | $ 1,512.23 | 1992 | $ 5,637.98 |
| 1978 | 3,699.93 | 1993 | 6,062.35 |
| 1979 | 4,172.19 | 1994 | 7,906.37 |
| 1980 | 4,486.83 | 1995 | 6,156.76 |
| 1981 | 4,393.59 | 1996 | 4,100.15 |
| 1982 | 9,820.59 | 1997 | 5,231.90 |
| 1983 | 575.68 | 1998 | 0.00 |
| 1984 | 2,542.65 | 1999 | 5,354.32 |

Case 6:07-cv-03305-REL   Document 15   Filed 01/20/09   Page 5 of 63

| 1985 | 1,110.01 | 2000 | 361.08 |
|---|---|---|---|
| 1986 | 8,535.85 | 2001 | 7,180.38 |
| 1987 | 11,332.26 | 2002 | 3,345.02 |
| 1988 | 4,832.48 | 2003 | 0.00 |
| 1989 | 247.26 | 2004 | 0.00 |
| 1990 | 0.00 | 2005 | 0.00 |
| 1991 | 0.00 | 2006 | 0.00 |

(Tr. at 121, 283).

**Disability Report**

On April 10, 2003, plaintiff completed a Disability Report (Tr. at 133-142). Plaintiff reported that he first became unable to work due to deep depression and a blind right eye on August 30, 2002 (even though his alleged onset date was January 1, 2002) (Tr. at 134). He reported that he stopped working on August 30, 2002, because his depression became so overwhelming that he could not leave his house and he was fired (Tr. at 134). Plaintiff reported that he was treated at Cox Burrell Behavioral Health for depression and thoughts of suicide (Tr. at 138). When asked what treatment he received, he wrote, "Not enough" (Tr. at 138). Plaintiff reported that he graduated from high school in May 1979 and that he completed Draughons Business College in 1983 after studying accounting (Tr. at 140).

6

**Claimant Questionnaire**

In a Claimant Questionnaire completed on May 7, 2003, plaintiff reported that he is able to shop for groceries, do household repairs, and iron (Tr. at 160-163). He reported that he goes outside his home two to three times per week either walking, riding a bus, or getting a ride from a friend (Tr. at 162). He either goes to a grocery store or a convenience store, and is usually there not more than an hour (Tr. at 162).

**Function Report**

In a Function Report dated March 27, 2005, plaintiff was asked to describe what he does all day (Tr. at 298). He wrote:

> Wake up go to bathroom, worry about what will happen today,
> hope no one knocks on door or calls. Drink a cup of coffee
> - turn on T.V. Think of what to do, my life stinks, take a
> nap. Finally fix something to eat. Nothing to do today
> it's raining, make sure door is locked, watch for postman
> maybe something in mail. Way too many questions for SSA.
> Makes my eye hurt. Watch some more T.V. min & hours go by,
> it's dark now so I can check the mail. Eat something watch
> T.V. go to bed. Make sure door is locked.

Plaintiff reported that he is able to do household repairs and mow (Tr. at 300). He wrote that he gets frustrated due to lack of depth perception and that it is hard to use a screwdriver or put in a lightbulb (Tr. at 300). When asked to explain why he does not do housework or yard work, plaintiff wrote, "N/A" (Tr. at 301). Plaintiff goes out of his house to go to the doctor, the lawyer, Family Services, Social Security, or to shop for

7

groceries (Tr. at 301).  He walks or uses public transportation.
When asked if he can go out alone, he wrote, "No, I need Missy so
I know everything is alright." (Tr. at 301).

Plaintiff was asked to indicate which activities are
affected due to his condition (Tr. at 303).  He circled the
following:  lifting, squatting, bending, standing, reaching,
walking, stair climbing, seeing, memory, concentration, and
getting along with others (Tr. at 303).  When asked how he
handles stress, he indicated "not well" because he bites his
fingernails (Tr. at 304).

In the remarks section, plaintiff complained that "I have
not seen any doctor with one eye -- they send me to people that
have both eyes so what do they know what I'm going through". (Tr.
at 305).

**B.    *SUMMARY OF MEDICAL RECORDS***

On May 8, 2003, plaintiff saw David J. Lutz, Ph.D., a
clinical psychologist, as the request of Disability
Determinations in relation to a previous application (Tr. at 174-
179, 352-356).  Dr. Lutz's report reads in part as follows:

> PRESENTING PROBLEM
>     Mr. Mercer . . . reported that he generally is not
> happy.  Instead, he felt, "I'm 90% down."  He indicated that
> he does not feel sad, but frequently does not have much
> energy or hope.  He stated that he has lost interest in
> previously enjoyable activities, primarily fishing. . . .
> He stated that he has had times when all he wanted to do was
> sleep and dream because his dream life was much better than

8

other aspects of his life.  He believed that he has been this way for many years, but could remember a time when he was different.  He felt that his deteriorated mood has come on gradually, as he could not pinpoint any specific time.  He denied having had manic symptoms.

Mr. Mercer reported that he sometimes gets angry, and said that this has resulted in some problems in interactions with others. . . .

HISTORY

. . .  He stated that he attended school regularly, and was suspended from school once for drinking alcohol at a concert.  He stated that he generally got along with teachers and other students.

Mr. Mercer reported that he drinks alcohol primarily on weekends when he might drink 12 to 24 cans of beer.  He suggested that this has been typical of his drinking pattern. He reported that he has been charged with four DWI offenses with the last one having been about six years earlier.  He said that he spent two years in prison as the result of the last DWI charge.  He said that he has experienced blackouts, but denied withdrawal symptoms.  He indicated that he twice participated in alcohol treatment programs with the last time having been about three years earlier.  He did not feel that such programs were helpful. . . .

Mr. Mercer reported that he used marijuana and amphetamine in high school with his last usage having been 20 years earlier. . . .

Mr. Mercer reported that he was hospitalized in a psychiatric hospital about 15 years ago for two weeks. . . . He did not feel that the hospitalization was helpful. . . .

FAMILY HISTORY

Mr. Mercer reported that he has lived with a friend for about five months.  He said that prior to his current residence, he bounced from one situation to another.  He denied having been married or having had children.  He said that he had not been involved in any close relationships for many years. . . .

SOCIAL HISTORY

Mr. Mercer reported that he does not have contact with friends or neighbors.  "I really don't have many friends at all."  He stated that he had many friends in the past until

9

about five years ago, as he would go fishing with them and run around town.  He was not sure what had changed.

PHYSICAL COMPLAINTS
    Mr. Mercer reported that he is not currently taking medications, and has not taken psychotropic medications in the past.
    Mr. Mercer reported that about 18 years ago, his right eye was hit with a fishing sinker, resulting in loss of vision.  He denied having any significant physical or health problems.

EMPLOYMENT HISTORY
    . . .  He stated that his longest job was for two years as a groundskeeper for a motel.  He was not sure why this job ended.  He said that he was last employed about nine months ago for a temporary service.  He stated that he enjoyed this job because he did not need to get overly involved, and could decline or accept jobs as he liked.  He stated that he generally got along well with supervisors and coworkers on his different jobs.

DAILY ACTIVITIES
    Mr. Mercer reported that he gets up about 9:00 a.m., drinks coffee, and watches television.  He indicated that he drinks about seven to eight cups of coffee daily.  He reported that he prepares his meals, typically something that is easy to fix. . . .  He stated that in the afternoon and evening, he may go for a walk around the yard, and watches more television, especially dramas or movies.  He stated that he does his shopping, and does some household chores, such as washing dishes or laundry. . . .  He stated that he goes to bed about 10:00 p.m., and goes to sleep easily, but awakens two to three hours later.  He then has great difficulty returning to sleep, which he attributed to too many thoughts going through his head. . . .

MENTAL STATUS
    Mr. Mercer dressed appropriately in a t-shirt, jeans, and boots.  His hygiene was adequate. . . .
    Mr. Mercer arrived about 20 minutes early for the interview, stating that a friend brought him. . . .  He was responsive and cooperative.  He exhibited an appropriate range of affect.  He seemed to minimize the effects of his alcohol usage or did not seem to feel that his alcohol usage was greatly implicated in his problems.  He seemed able to

10

understand and respond to normal conversation.  His thoughts were logical and consistent.  He did not evidence any significant distressed affect, or unusual or bizarre behavior.  He reported that his behavior during the interview was atypical of his behavior in general, as he rarely talks this much.

Mr. Mercer denied having had hallucinations, paranoia, delusions, ideas of reference, compulsions, or obsessions.

Mr. Mercer was oriented to time, person, and place.  He remembered correctly six digits forward and four digits backward.  He counted backward from 20 to 1 in seven seconds with no errors.  He said the alphabet in eight seconds with no errors.  He did serial threes from 1 to 40 in 25 seconds with no errors.  He did serial sevens backward from 100 to 44 in 45 seconds with no errors.  On proverbs, to chickens, he responded, "If you ain't got it yet, don't count on it." To spilled milk, he stated, "You can't change the past."  To glass houses, he stated, "Don't talk about me, and I won't talk about you."  He remembered correctly three of three things immediately, and three of three things after five minutes.  He remembered correctly 15 of 15 items on the Rey test.  His short term memory and long term memory were consistent with his general intellectual functioning, which I would estimate to be in the average to possibly low average ranges.

* * * * *

DIAGNOSIS

Based on the client's subjective report of extensive alcohol usage, and observations of no obvious difficulties during this examination, the most appropriate diagnoses are likely to be:

Axis I:    Alcohol dependence
           Continues to drink alcohol despite substantial
           alcohol related problems in the past.
           Dysthymic disorder[2], mild to moderate, late onset

---

[2]Dysthymic disorder is a chronic mood disorder with a duration of at least 2 years. It is manifested as depressed mood for most of the day, occurring more days than not, and accompanied by at least 2 of the following symptoms:  poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, feelings of hopelessness. To diagnose dysthymia, any major depressive episodes must not have occurred in the first 2

11

```
                    He suggested that he has had some depressive
                    symptoms for many years.
        Axis II:    Schizoid characteristics
                    He may meet the criteria for a personality
                    disorder.
        Axis III:   Disfigurement to his right eye
        Axis IV:    Physical problem, unemployment, financial
                    difficulties, limited health care, limited
                    interpersonal contact, living situation
        Axis V:     GAF = 55³ (Current)
                    Moderate symptoms

        MEDICAL SOURCE STATEMENT
             Mr. Mercer seemed able to understand and remember
        simple and complex instructions.  He seemed able to sustain
        concentration and persistence on simple and moderately
        complex tasks, and probably complex tasks.  He seemed able
        to interact in moderately demanding social situations.  He
        seemed able to adapt to his environment.
```

On May 13, 2003, Kenneth Burstin, Ph.D., a clinical

psychologist, completed a Psychiatric Review Technique in

connection with a previous application for benefits (Tr. at 180-

193).  Dr. Burstin found that plaintiff's mental impairment,

dysthymia, was not severe.  He found that plaintiff suffers from

mild restriction of activities of daily living; mild difficulties

in maintaining social functioning; no difficulties in maintaining

concentration, persistence, or pace; and has had no episodes of

decompensation.  In support of his findings, Dr. Burstin wrote:

---

years of the illness and history of mania should not exist.

[3]A global assessment of functioning of 51 to 60 means
moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social,
occupational, or school functioning (e.g., few friends, conflicts
with peers or co-workers).

Claimant alleges depression.  Evidence indicates application at DFS, November, per Ms. Ray.  No complaints of/no symptoms [illegible] memory problems.  Claimant has sought no treatment or medication management.  Last hospitalization 5 years ago.  Claimant currently drinks 12-24 cans of beer per weekend.  Consultative exam Lutz 5-8-03. Findings on exam essentially within normal limits.  [illegible] Lutz given significant weight."  The remainder of the consultant's notes are illegible.

On March 16, 2004, plaintiff saw David Paff, M.D., an occupational medicine specialist, at the request of the Division of Family Services (Tr. at 195-196).  At the time plaintiff was 42 years of age and was living with a roommate who was on SSI disability.  Plaintiff had been smoking one pack of cigarettes per day for the past 25 years.  He reported drinking a 12-pack of beer on the weekends.  He reported that he had not used illicit drugs for five years, and even then he had used only marijuana and "no other drugs."  Plaintiff reported that he gets out of breath but can go up and down stairs, does not have difficulty breathing at night or when lying flat.  "He is not sure when he gets out of breath, but it has nothing to do with exercise apparently."  Plaintiff said he feels sad but does not cry.  On physical exam, Dr. Paff found a "pleasant, cooperative gentleman in no distress."  Plaintiff was able to walk normally, walk on heels and toes, squat fully.  He had full range of motion in his lumbar spine, cervical spine, and shoulders.  Plaintiff's chest x-ray was normal.  Pulmonary function testing was normal.

13

Plaintiff's blood work was all normal, urinalysis was normal, kidney and liver function testing was normal, and lipid panel was normal. In summary Dr. Paff wrote, "This is a gentleman who has some fatigue, depression, and loss of vision in his right eye. He is not disabled."

On March 17, 2004, plaintiff had a psychological evaluation performed by Eva Wilson, Psy.D., at the request of the Division of Family Services (Tr. at 206-208, 360-362). Dr. Wilson's report reads in part as follows:

> IDENTIFYING INFORMATION AND REFERRAL SOURCE: Mr. Mercer identified himself with the use of a non-driver's license. He has lost his driver's license due to multiple D.W.I.'s. He arrived on time for his appointment and was driven to the appointment by a friend. He was referred by Amy Grisaffe of the Greene County Division of Family Services in Springfield, Missouri. Mr. Mercer is attempting to qualify for medical assistance.
>
> * * * * *
>
> PRESENTING PROBLEM AND SYMPTOMS: Mr. Mercer presents with what he describes as being depression. He lacks motivation. He does not want to get out of the house very often and sleeps too much. He denies suicidal ideation. He does admit to having a drinking problem and drinks approximately a twelve pack of beer on the weekends when he can afford it. He has not worked since August 2002. He is not being treated at this time and has not been treated since the mid-80's for depression. . . . He has been treated for alcoholism in the Sigma House in Springfield, Missouri in 2002.
>
> PRESENT MENTAL ILLNESS: It appears that Mr. Mercer is suffering from a dysthymic disorder and a dependence on alcohol. He is not in treatment at this time nor has he been for some time.

14

PAST HISTORY OF MENTAL ILLNESS AND SUBSTANCE ABUSE:  Mr.
Mercer has used and abused marijuana five years ago and
claims that he has not used it since.  He also used alcohol
most of his life and said that drinking a twelve pack on the
weekends is very small compared to what he used to use.  He
was treated at St. John's Marian Center in the mid-1980's as
well as Cox hospital in the 1980's for depression.  He
denies suicide attempts.

FAMILY CIRCUMSTANCES:  Mr. Mercer was born in Springfield,
Missouri and grew up here.  He said that he was happy only
50% of the time because his stepfather was verbally abusive
to him.  He said, however, that his mother was good to him.
. . .  He has never been married and has no children.  He
said that he got close to being married on two occasions but
his drinking got in the way. . . .  He has had four D.W.I.'s
and spent two years in jail between 2000 and 2002 for these
offenses.

GENERAL APPEARANCE:  Mr. Mercer has a very unusual
appearance in that he has very thick, long, brown hair below
his shoulders and wears a headband. . . .  He was casually
dressed in black pants, a blue jean jacket, and shoes and
his hygiene was adequate.

BEHAVIOR:  Mr. Mercer was very pleasant and cooperative and
exhibited no unusual mannerisms.

MOOD:  Mr. Mercer appeared to be in a happy mood today and
showed no signs of depression or anxiety.

AFFECT:  Mr. Mercer's affect was consistent with his mood.

SPEECH:  Mr. Mercer's speech was normal for age and
intellect.

THOUGHT CONTENT AND PERCEPTION:  These were also within
normal limits.

MODIFIED MINI MENTAL STATUS EVALUATION:  Mr. Mercer produced
a score of 54, which is in the above average range of
intellectual and memory functioning.

MINNESOTA MULTIPHASIC PERSONALITY INVENTORY - 2 RESULTS:
Mr. Mercer produced a profile indicating that he was
exaggerating his mental problems.  Despite this, he is

Case 6:07-cv-03305-REL   Document 15   Filed 01/20/09   Page 15 of 63

suffering from depression, anxiety, and anti-social
attitudes.  He also feels alienated from family and society.

MEDICAL SOURCE STATEMENT/OPINION:  It is my opinion that Mr.
Mercer is capable of understanding and remembering simple,
semicomplex, and complex instructions.  I believe that he
could sustain concentration and persistence with simple,
semicomplex, and complex tasks.  I do not believe that he
would have trouble interacting socially or adapting to his
environment. . . .

PROGNOSIS AND RATIONALE:  Prognosis is good for this
gentleman.  I believe that he may have some motivation
problems due to dysthymia and anxiety, however, they do not
appear to be severe enough to cause him to be disabled.
Abstinence from alcohol would also be of help.

* * * * *

DIAGNOSTIC IMPRESSIONS:

Axis I:    Alcohol Dependence, longstanding
           Dysthymic Disorder
           Generalized Anxiety Disorder
Axis II:   Personality Disorder, NOS, antisocial features
           noted
                    * * * * *
Axis V:    Current G.A.F. (Psych), 70,[4] mild to 60, moderate
           Past Year, 70 mild to 60, moderate

On April 1, 2004, Dr. Wilson completed a Medical Source

Statement - Mental (Tr. at 211-212, 358-359).  Dr. Wilson found

that plaintiff was not significantly limited in the following:

■ The ability to remember locations and work-like procedures

_____

   [4]A global assessment of functioning of 61 to 70 means some
mild symptoms (e.g., depressed mood and mild insomnia) or some
difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but generally
functioning pretty well, has some meaningful interpersonal
relationships.

16

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

She found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

On October 28, 2004, Sharol McGehee, Psy.D., a licensed psychologist, performed a psychological evaluation at the request of Greene County Division of Family Services (Tr. at 364-366). Dr. McGehee's report reads in part as follows:

<u>Identifying Information and Mental Status Examination</u>
. . . He was neat and clean in appearance and was wearing appropriate casual clothing. He exhibited adequate personal hygiene. Facial expressions were appropriate, and eye contact was adequate. There were no bizarre or unusual gestures or mannerisms. He was a cooperative individual who related well with the examiner. He appeared to be experiencing a severely anxious and depressed mood. Affective responses were congruent and appropriate. His speech was clear, logical and coherent. It was relevant and goal-directed. There was no evidence of loose or bizarre thought associations. He was not psychotic. He denied hallucinations and delusions. There was no evidence of flight of ideas, circumstantiality, derailments, blocking or obsessions. He was oriented as to time, place, person and purpose.

<u>Background History</u>
Darryl is the only child born to his parents who were divorced. He was reared by his dad and stepmother and has a half brother. He also has two half siblings from his mother. He graduated high school and has worked most of his life in general unskilled labor or dishwashing. His last job was with a waste disposal company. He spent one summer washing trashcans. He finally walked off the job. He has not had a job in two years. He is an alcoholic, but has not used anything since April 6th. He continues to smoke one

pack of cigarettes a day.  He has not used marijuana, his
only drug, for two years.  He has been arrested for a total
of four times and spent 11 months in jail.  He has no
military history.

Problem and Pertinent History
The claimant describes some agoraphobia.  He has difficulty
leaving his house.  He becomes very edgy and nauseous.  He
has difficulty being around people.  He lost his right eye
after he was hit with a fishing sinker several years ago.
He also has bad teeth with a bone tumor growing through the
skin of his gums.  The only medication he is taking is
penicillin for the tooth.  He has no physician.  He is
currently living with a friend.  He was admitted to the
Marian Center in the 1980's after he "freaked out".  He was
unable to give any more explanation.  He was at Cox
Psychiatric Unit later in the 1980's.

Tests Administered
Clinical Interview & Mental Status Exam
The Michigan Alcohol Screening Test (MAST)
Personality Assessment Screener (PAS)

Test Results
The MAST reveals moderate alcoholism.  The PAS reveals a
markedly disturbed man who feels extremely helpless,
hopeless, worthless, inadequate and insecure. He is markedly
angry and has difficulty controlling that anger.  He is apt
to become either verbally or physically violent.  He has a
number of health problems and concerns that may be directly
related to the depressive symptoms.  He is extremely
withdrawn and alienated from other people and is a very high
risk for suicidal ideation and gesturing.

Summary
. . .  Based on this evaluation he meets the criteria for
medical assistance.

Diagnosis
Axis I    Generalized Anxiety Disorder
Axis II   Personality Disorder NOS with dependent and
          avoidant features
Axis III  Loss of right eye and needs dental work

19

```
Axis IV    Occupational problems - unemployment
           Economic problems - no income
           Problems with access to healthcare - lack of funds
           to provide needed healthcare
Axis V     Current GAF:  38[5]
```

On November 18, 2004, plaintiff saw Judd McNaughton, M.D., an eye surgeon, for a disability determination in connection with a previous disability application (Tr. at 216, 369-371).  Dr. McNaughton found that plaintiff had 20/20 vision in his left eye and was blind in his right eye.  "He would have difficulty performing tasks requiring vision in both eyes.  However, he does very well with his vision in the left eye.  Of course, he has no stereoscopic vision given his no light perception status in the right eye."

On November 22, 2004, Judd McNaughton, M.D., completed a Visual Consultative Evaluation (Tr. at 214-215).  Dr. McNaughton found that plaintiff would have no visual limitations in reading, the ability to work on a computer, or the ability to work under fluorescent lights, nor would he need rest periods for his eyes after performing these activities.  Dr. McNaughton found that plaintiff would be limited in his ability to perform fine work

---

[5]A global assessment of functioning of 31 to 40 means some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

such as reaching, handling, and manipulating small objects due to
lack of stereoscopic vision (he is blind in one eye) and he has
poor depth perception up close.  Dr. McNaughton found that
plaintiff would be limited in his ability to ambulate in a
strange environment.  "He would need to turn his head farther to
the right to see peripherally because his right eye has no vision
(He has reduced right field of vision)."  Finally, Dr. McNaughton
confirmed the existence of floaters which "may cause very brief
blurriness when they cross the visual axis."

On March 1, 2005, plaintiff filed the instant application
for disability benefits.

On April 19, 2005, Kenneth Burstin, Ph.D., completed a
Psychiatric Review Technique (Tr. at 372-385).  Dr. Burstin found
that plaintiff suffers from affective disorders (dysthymia),
anxiety-related disorders (general anxiety disorder), and
personality disorders (personality disorder not otherwise
specified).  He found that plaintiff has moderate restriction of
activities of daily living; mild difficulties in maintaining
social functioning; mild difficulties in maintaining
concentration, persistence, or pace (and Dr. Burstin wrote
"complex tasks" here); and has experienced no episodes of
decompensation.  In support of his findings, Dr. Burstin wrote:

> Earliest possible onset would be 2/11/02, the day following
> OHA [office of hearing appeals] denial.

Case 6:07-cv-03305-REL   Document 15   Filed 01/20/09   Page 21 of 63

The claimant is not being treated for a mental impairment, and therefore, there is no relevant MER since OHA decision. There were three evaluations reviewed by ALJ, which are in the file:

There was a 2003 CE [consultative exam], in which the examiner concluded that the claimant could probably sustain complex taks [sic], that he could interact in moderately-demanding social situations, and could adapt.

A 3/17/04 DFS eval noted that the claimant continued to abuse etoh [alcohol]. He demonstrated no evidence of depression or anxiety, MMSE [mini mental status exam] was wnl [within normal limits], and MMPI-2 [Minnesota multi-phasic personality inventory-2] was considered to have been exaggerated. MSO was that claimant was not severely limited, although, inconsistently, the examiner rated some moderate limitations on a subsequent check-block mso.

A 10/04 DFS exam concluded that the claimant met criteria for assistance. However, among other issues, the claimant denied etoh since earlier in the month of the DFS eval in 3/04, which appears inconsistent with his admission of ongoing usage later in the month. The claimant was cooperative and was not described as having demonstrated cognitive limitations. The claimant was said to have manifested severely anxious and depressed mood (although depression was not diagnosed) and specific signs/symptoms were not described. The validity of testing was also not addressed.

Overall, severity of objective evidence is inconsistent with objective findings, leaving aside the issue of duration and associated issue of lack of treatment, and leaving aside the unresolved issue of whether claimant is still drinking. There was also suggestions of attempt to exaggerate symptoms on testing in 3/04. Allegations are considered partly C&C, in that MDIS established, but there is no evidence of disabling severity.

It is concluded that the claimant can sustain simple tasks, interact in settings with limited public-contact demands, and adapt to moderately-complex environments.

22

That same day, Dr. Burstin completed a Mental Residual
Functional Capacity Assessment (Tr. at 386-388). He found that
plaintiff is not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple
  instructions

- The ability to carry out very short and simple instructions

- The ability to maintain attention and concentration for
  extended periods

- The ability to perform activities within a schedule,
  maintain regular attendance, and be punctual within
  customary tolerances

- The ability to sustain an ordinary routine without special
  supervision

- The ability to work in coordination with or proximity to
  others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek
  without interruptions from psychologically based symptoms
  and to perform at a consistent pace without an unreasonable
  number and length of rest periods

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately
  to criticism from supervisors

- The ability to get along with coworkers or peers without
  distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to
  adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work
  setting

23

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to interact appropriately with the general public

Dr. Burstin concluded with the following:

> The claimant retains the capacity to acquire and retain moderately-complex instructions, and to sustain concentration and persistence with moderately-complex tasks.

> The claimant can relate adequately to others in settings which do not require frequent public contact or unusually close interaction, and can respond to changes in non-complex work environments.

(Tr. at 388).

On October 25, 2005, saw Rachel Hankins, M.D., to establish care (Tr. at 425-426). He listed "back pain" as his chief complaint. He reported that he was applying for Social Security disability, he engaged in no routine exercise, he had poor dietary habits, he was smoking one pack of cigarettes per day, and he was not using illicit drugs. He reported that he quit drinking in July 2005.

24

Dr. Hankins observed that plaintiff was in no acute distress. He had normal range of motion in his back and no obvious deformities. He was alert and oriented, his behavior and affect were appropriate, his gait was steady. She assessed low back pain and fatigue/malaise. She recommended over-the-counter Tylenol or Ibuprofen for his back pain, and ordered blood work due to his complaints of fatigue. "Counseled re: smoking cessation. Advised to quit."

That same day plaintiff had a lipid panel done which showed his overall cholesterol was high at 213 (normal is below 200), his HDL was low at 25 (normal is greater than 40), and his triglycerides were high at 266 (normal is 0-150) (Tr. at 420). His CMP (comprehensive metabolic panel) was essentially normal, as was his complete blood count (Tr. at 421-424).

On January 24, 2006, plaintiff saw Dr. Hankins for a check up (Tr. at 418-419). Plaintiff complained of low back pain and "occasional boils on buttocks." He reported that he was applying for Social Security disability benefits, he engaged in no routine exercise, he had poor dietary habits, he was smoking one pack of cigarettes per day, was using no illicit drugs, and he reported that he quit using alcohol in July 2005.

Dr. Hankins observed that plaintiff was in no acute distress, he had a "few small scabs on buttocks". She diagnosed

25

boils, recurrent.  She told plaintiff to do stretches and use over-the-counter medicine for his back pain, and she ordered x-rays.  She prescribed Hibiclens [a topical antiseptic] for his skin lesions.  "Smoking cessation counseling:  Discussed health risks of smoking and benefits of cessation.  Advised to quit."

On January 25, 2006, plaintiff had x-rays taken of his lumbar spine (Tr. at 416-417).  He had mild to moderate endplate spurring with in the lumbar spine with no evidence of spondylosis[6] or spondylolisthesis[7].

On April 10, 2006, plaintiff saw Dr. James Jarvis at Burrell Behavioral Health for a psychiatric evaluation (Tr. at 409-412). Plaintiff said he had always been anxious around others and gets depressed a lot.  "He has worked general labor most of his life and has applied for disability.  He's waiting for his hearing." Plaintiff reported that he had spent nine months in jail for "too many DWI's."  He denied any use of drugs.  "He used to have a drinking problem and got several DWI's.  He says he quit on his own and has been sober for 3 years.  He doesn't attend AA meetings."

---

[6]Spinal osteoarthritis, a degenerative disorder that may cause loss of normal spinal structure and function.  Aging is the primary cause.

[7]Spondylolisthesis occurs when one vertebra slips forward on the adjacent vertebrae. This will produce both a gradual deformity of the lower spine but also a narrowing of the vertebral canal. It is often associated with pain.

26

Plaintiff denied any suicidal thoughts, ideations or ruminations. "He presents no threat of becoming violent." Plaintiff was casually dressed and his hygiene was fair. His behavior was cooperative and open and his mood was depressed. His affect was consistent with his mood. His speech was within normal limits for volume, rate, rhythm and tone. His thought process was clear, linear and goal-directed. There were no perceptual distortions, delusions or hallucinations. He was oriented times four and appeared to Dr. Jarvis to be in the average to below-average range of intelligence. His memory was good for both recent and remote events with good recall of both. His insight into his illness was "just fair and his judgment seems just fair as well."

Dr. Jarvis assessed major depressive affective disorder, recurrent, moderate, and social phobia. Plaintiff's GAF was 48.[8] "Darryl is depressed and stays too isolated. He has no friends except his roommate. Hopefully, getting on meds will help lift his depression enough for him to become more active. He agreed to work with me and I will encourage him to become less isolated and get out more. He needs a plan for each day. I will also

---

[8]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

suggest that he become more physically active such as taking walks. More social interaction would help him with his depression. Darryl's prognosis is guarded at this time due to the chronic nature of his symptoms."

On May 8, 2006, Sharol McGehee, Psy.D., a licensed psychologist, performed a psychological evaluation at the request of Greene County Division of Family Services (Tr. at 398-400). The first two sections of Dr. McGehee's report are almost word-for-word identical to the report she prepared on October 28, 2004. The first section, "Identifying Information and Mental Status Examination," is the same, even to the extent of identifying plaintiff as being 43 years old both in 2004 and in 2006. The only differences are that plaintiff was listed as weighing five pounds more in 2006, and he was observed as being moderately anxious in 2006 whereas he was listed as severely anxious in 2004. The second section, "Background History" indicates in 2004 that plaintiff was raised by his father and stepmother, but in 2006 says he was raised by his mother and stepfather.

The remainder of the form reads in part as follows:

Problem and Pertinent History
The claimant describes symptoms of depression. . . . He has made no suicide attempts, but he admitted to current suicidal ideation.

28

Tests Administered
Clinical Interview & Mental Status Exam
The Michigan Alcohol Screening Test (MAST)
Personality Assessment Screener (PAS)
Mood Disorder Questionnaire (MDQ)

Test Results
The MAST reveals moderate alcoholism.  The MDQ rules out
bipolar disorder.  The PAS is extremely elevated.  This
tends to be due to response factors that tend to distort
scores in a pathological direction.  This distortion usually
arises from a strongly negative cognitive set that is
sometimes seen in severe depression and personality
disorders that leads the client to magnify symptoms and
misfortunes.  His pattern of PAS scores reveals an extremely
high potential for emotional and behavioral problems of a
clinically significant nature.  Darryl is severely depressed
with symptoms of helplessness, hopelessness, worthlessness,
inadequacy, and insecurity.  He is a high risk for suicidal
ideation and gesturing and is currently experiencing
thoughts of death and suicide.  He is chronically angry and
tends to express his anger and hostility through both
physical and verbal violence.  He is withdrawn and alienated
from other people.  He shows little apparent interest or
investment in relationships.  He feels that other people
treat him unfairly and as if he has no support system.
Externalizing features, such as acting out and projection,
are his primary defense mechanisms.  He tends to place
considerable blame onto other people for his personal
problems. He is impulsive, sensation seeking, and reckless,
and shows a general disregard for convention and authority.
He has a number of health problems and concerns that may be
directly related to the depressive symptoms.  The symptoms
that he describes range from vague symptoms of malaise to
severe dysfunction in specific organ systems.

Summary
. . .  He had all of his teeth extracted in 2005 because of
a tumor in the bone of his gums.  He is extremely withdrawn
and alienated from other people.  He is a high risk for
suicidal ideation and gesturing.  He is also quite angry and
tends to act out that anger, so that he may become either
verbally or physically violent.  He generally feels
helpless, hopeless, worthless, inadequate, and insecure.
Based on this evaluation he meets the criteria for medical
assistance.

29

<u>Diagnosis</u>

```
Axis I     Generalized Anxiety Disorder
Axis II    Personality Disorder NOS with dependent and
           avoidant features
Axis III   Loss of right eye, low back pain
Axis IV    Occupation problems - unemployment
           Economic problems - no Income
Axis V     Current GAF:  38
```

On May 23, 2006, plaintiff saw Marilyn Corson, registered practical nurse at Burrell Behavioral Health (Tr. at 406-408). Plaintiff was clean and neatly dressed. He said he wanted to find out why he was so depressed, and that he could not stand to be around people or leave the house.

> The patient believes he has been depressed almost forever. He has had problems being around people for the last 3-4 years. Today he states he is anhedonic[9] and feels sad and worthless. He is going to bed at 11 or 12, falling asleep in one hour, then he wakes up four hours later, smokes a cigarette, and goes back to sleep until 7 a.m. He feels tired in the mornings. . . . He denied episodes of hypomania. He did state that he was a worrier with irritability and inner restlessness at times. He denied symptoms of panic. He denied symptoms of OCD [obsessive compulsive disorder]. He states when angry he can break things. He had some suicidal ideation yesterday when he was thinking that he would have no worries and would be out of his present situation. However, he has not figured out a way that would not hurt. . . . [H]e promised his father that he would not do anything because "it would kill my mother." He has never been abused.

Plaintiff reported that he had received four DWIs and did "one year in the Department of Corrections." He was smoking one pack of cigarettes per day, drinking three cups of coffee per

---

[9]The inability to gain pleasure from normally pleasurable experiences.

day, had been sober for two to three years. "He states he liked to drink and it gave him no worries until later. He used marijuana until 2001." Plaintiff denied current suicidal or homicidal ideation. He was alert and oriented with good grooming and eye contact. His psychomotor activity was normal; speech rate was normal, coherent, logical, and goal directed without flight of ideas or loose associations. His affect was bland but brightened. He evidenced adequate insight and judgment. He said there were times when he felt "watched by others. He has seen shadows out of the corner of his eyes two to three times a month and has heard his name called two to three times in his life."

Ms. Corson diagnosed major depression, recurrent, severe with psychotic features. His current GAF was 50. Ms. Corson gave plaintiff a handout explaining the hazards of alcohol abuse, marijuana use, and caffeine overuse. He was given a prescription for Celexa [antidepressant] 20 mg daily. A card was given with the office number and "he was encouraged to call if he had questions or problems."

On May 31, 2006, plaintiff saw Dr. James Jarvis at Burrell Behavioral Health (Tr. at 405). Plaintiff's mood was anxious. His mental status was within normal limits. "He's been working on his disability papers and hopes his case will come up soon. He continues to isolate himself and not go out much. . . . [W]e

31

set some goal[s] of getting him out more and having a plan for each day. He said he would try to do this. He has trouble talking to others and got very anxious during the session today."

On July 3, 2006, plaintiff was seen at Family Medical Care Center by Rachel Hankins, M.D. (Tr. at 414). He had been seen in the emergency room for a methicillin resistant staphylococcus aureus (MRSA) infection[10]. He was treated with Bactrim and was told to follow up with his doctor. The abscess was improved and was no longer draining. Plaintiff was alert and oriented, his behavior and affect were appropriate. He had a small scabbed area with surrounding discoloration on the left posterior thigh. There was no draining, no erythema, it was nontender. Dr. Hankins refilled plaintiff's Hibiclens [topical antiseptic] and gave him Bactroban [topical antibiotic] for eradication of the MSRA. "Smoking cessation counseling: Discussed health risks of smoking and benefits of cessation. Advised to quit."

On August 8, 2006, plaintiff saw Marilyn Corson, Registered Practical Nurse, at Burrell Behavioral Health (Tr. at 403-404).

> The patient states he missed his last appointment because he
> could not get a ride. However, he knows how to get here by
> bus. He states he has been about the same, still down. He
> states anxiety feels about the same and that it is hard to
> get out with others. He admits that he does not do anything
> during the day.

---

[10]A strain of staph that is resistant to the broad-spectrum antibiotics commonly used to treat it. MRSA can be fatal.

He states he has some passive suicidal ideation daily, but then distracts himself. He denied plan with intent. He was alert and oriented with good hygiene and eye contact. His speech rate was normal, coherent, logical, and goal directed. His affect was bland. He evidenced adequate insight and judgment. He states from time to time, the fan "talks to me," as if there was a radio station playing. He states he is always hiding from others.

Current Medications: Celexa [antidepressant] 20 mg one at 5 p.m. because he felt, when he took it at bedtime, that it caused him to stay awake. He is going to bed at 10 and is asleep by 10:30 or 11. He is getting up at 2 a.m. to drink a glass of milk and smoke. Then, he is up until he gets tired and goes back to bed.

Therapy provided: His treatment plan was reviewed. The patient states he is sober and clean. He worked with vocational rehabilitation at one time and worked at detailing cars in the 80's, but admits he has not followed through recently. He states he is not making a plan for his day as suggested by Dr. Jarvis. He washes up his own dishes and waters the garden in the evening. He was encouraged to work with therapy, to set goals for himself, to get out of the house, and be more active as this would help him conquer his anxiety and relieve his depression.

Impression: Patient continues to isolate and has difficulty with middle insomnia and with mood.

Plan: . . . Increase Celexa to 40 mg one daily. . . . Begin Geodon [antipsychotic] 40 mg one at bedtime for one week and then increase to two at bedtime with food. A prescription was written for 60 with three refills. . . . He was encouraged to call if he had questions or problems. . . .

On August 21, 2006, Dr. McGehee completed a Medical Source Statement - Mental (Tr. at 396-397). Dr. McGehee found that plaintiff was **not significantly limited** in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to be aware of normal hazards and take appropriate precautions

She found plaintiff **moderately limited** in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

She found plaintiff **markedly limited** in the following:

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to interact appropriately with the general public

- The ability to travel in unfamiliar places or use public transportation

She found plaintiff **extremely limited** in the following:

- The ability to work in coordination with or proximity to others without being distracted by them

34

- The ability to complete a normal workday and workweek
  without interruptions from psychologically based symptoms
  and to perform at a consistent pace without an unreasonable
  number and length of rest periods

- The ability to accept instructions and respond appropriately
  to criticism from supervisors

- The ability to get along with coworkers or peers without
  distracting them or exhibiting behavioral extremes

- The ability to set realistic goals or make plans
  independently of others

On September 12, 2006, plaintiff saw James Neal, M.D., a psychiatrist at Burrell Behavioral Health, for a follow-up of his major depression (Tr. at 402, 428). Plaintiff did not believe the increase in Celexa made any difference. Dr. Neal reviewed Ms. Corson's motes. "He does have a very anxiety-stricken avoidant way of dealing with individuals and it really looks to me as though he may have some social anxiety features going on. He states he didn't like the way Geodon [antipsychotic] made him feel. He [felt] as though it made him excessively drowsy and he couldn't get up the next morning and so he did not get it filled after running out of the first month's supply. He expressed worry that he was going to be fussed at or that the provider would be angry with him. I pointed out to him that it would have been a little better to let us know that he was having trouble so that we would understand that sooner".

Dr. Neal prescribed Effexor [antidepressant]. "I pointed out to him that when somebody has had depression for this many years it is going to take at least a couple of months to feel a significant difference. He was agreeable with this."

On December 7, 2006, plaintiff saw Marilyn Corson, a registered practical nurse, at Burrell Behavioral Health (Tr. at 429-430). "The patient states he has been as normal as ever, which means he is not doing very well. He is living with his girlfriend and admits he is not doing anything with his life. He reviewed his job history, stating that he walks off of jobs. He states that the Geodon gave him a hangover and the Celexa did not help. He continues to feel helpless and hopeless and has considered which rib to penetrate by a knife. However, he has not gotten the knife out. He states this hopelessness has increased over the last 2-3 weeks. He was reminded to call the crisis line should these feelings become overwhelming. He was agreeable. He was alert and oriented with good hygiene, but downcast eye contact. His speech rate was normal, coherent, logical, and goal directed. His affect was bland and depressed with little brightening. He evidenced adequate insight and judgment. He denied delusions or impaired reality, but states he feels paranoid about the whole world."

36

Plaintiff's Effexor [antidepressant] was increased, he was prescribed Remeron [antidepressant], and he was "encouraged to call if he had questions or problems and the use of the crisis line was thoroughly reviewed."

C.  **SUMMARY OF TESTIMONY**

During the December 21, 2006, hearing, plaintiff testified; and Michael Lala, a vocational expert, testified at the request of the ALJ.

1.  **Plaintiff's testimony.**

Plaintiff graduated from high school (Tr. at 496).  He was 5'10" tall and weighed about 225 pounds (Tr. at 496).  Plaintiff did not have a driver's license as it had been revoked (Tr. at 497).  He has not checked to see if he can apply for a new license because the bus system in Springfield is pretty good (Tr. at 497).  Plaintiff admitted he has no side effects from any of his medication (Tr. at 498).

At the time of the hearing, plaintiff said he was bathing about every three or four days (Tr. at 499).  He does not get dressed on most days (Tr. at 499-500).  Prior to his alleged onset date, he bathed daily and got dressed daily (Tr. at 500).  Plaintiff has not enjoyed life for four or five years (Tr. at 500).  Plaintiff testified that he has had problems with his memory for the past four or five years (Tr. at 501).

37

Plaintiff has lived with Missy Davis since 2003 (Tr. at 502). He is blind in his right eye and he has problems with depth perception because of that (Tr. at 502). His blind eye did not interfere with his ability to drive (Tr. at 502). His left eye blurs and fogs up (Tr. at 503). He gets floaters in his left eye that last 20 minutes to an hour (Tr. at 503). Plaintiff has no trouble watching television, and he watches television about ten hours per day (Tr. at 503).

Plaintiff feels sad about 95 percent of the time (Tr. at 503). Plaintiff's anger has gotten him in trouble as he has had the police called on him several times for breaking things (Tr. at 505). Plaintiff has panic attacks whenever he has to go anywhere (Tr. at 505, 508). Plaintiff goes to the store with Ms. Davis because he stays calmer if she is there (Tr. at 506-507). People in public make him mad, but he holds it in and waits until he gets home to vent (Tr. at 507). Plaintiff had no memory of having problems with supervisors when they would chastise him or watch him too closely (Tr. at 507).

Plaintiff has pain in his lower back (Tr. at 509). He has suffered from this back pain since at least February 2005 (Tr. at 510). He does stretching exercises and takes Ibuprofen to relieve the pain (Tr. at 510). Plaintiff also has problems with his hands swelling up and his palms itch and turn a blotchy red

38

(Tr. at 511). That symptom began about a year and a half before the hearing and is caused by working with his hands (Tr. at 511). Plaintiff does not do anything to relieve the symptoms (Tr. at 511). He talked to his doctor about it once but she blew him off because he said he had been pulling weeds and she thought he had gotten into something (Tr. at 512). He said he was just pulling up little tree sprouts (Tr. at 512). Plaintiff also has severe pain in his shins, and he believes he could only walk about a half a mile or so due to the pain (Tr. at 512). He has had this shin pain since at least February 2005 (Tr. at 512-513). To relieve the pain plaintiff takes his shoes off and sits down (Tr. at 513). Standing and walking for more than a couple of hours cause pain in plaintiff's feet (Tr. at 514). Plaintiff's back hurts from sitting, but sitting up straight in a kitchen chair helps (Tr. at 515). He thinks he could sit for 45 minutes to an hour at a time (Tr. at 516). Plaintiff usually takes a couple of naps each day "just to get out of my head" (Tr. at 516). He naps for about two hours each day (Tr. at 516).

Sometimes plaintiff sees a shadow out of the corner of his eye, and he thinks it is someone looking around the corner (Tr. at 517). Every once in a while, he hears someone calling his name but there is no one there (Tr. at 517).

39

Plaintiff quit his last job because he had too many things going on inside his head (Tr. at 519). His brain brings up sad stuff and bad things that he has done (Tr. at 519). His job was washing trash cans (Tr. at 520). Plaintiff did not have contact with other people on that job (Tr. at 520).

Plaintiff has been in the emergency room three times in the last year due to boils (Tr. at 521). They are painful and it makes it difficult for him to sit and stand (Tr. at 522). His doctor told him to take a bath twice a day to reduce the risk of the boils flaring up (Tr. at 522). He was given Hibiclens, a special soap that is used before surgeries, but he does not use it (Tr. at 522-523).

**2. Vocational expert testimony.**

Vocational expert Michael Lala testified at the request of the Administrative Law Judge.

The first hypothetical involved a person with no physical limitations but who would need to avoid climbing heights or exposure to potentially dangerous and/or unguarded moving machinery and commercial driving, who would need to work on an even surface, would not need depth perception to perform his duties, would need simple and repetitive job instructions, would have no more than minimal contact with the public and no customer service, would have no more than minimal contact with co-workers

40

and supervisors with no teamwork, and could not work in healthcare or the food service industry (Tr. at 525-526). The vocational expert testified that such a person could perform plaintiff's past relevant work as a cleaner or laundry worker (Tr. at 526, 530). The vocational expert testified that the person could also perform the unskilled job of vehicle cleaner with 3,800 in the region and 510,000 in the country (Tr. at 529), baggage porter, with 1,200 in the region and 119,000 in the country (Tr. at 535-536), routing clerk with 3,600 jobs in the region and 226,000 in the nation (Tr. at 538), or scale operator with 2,000 job in the region and 145,000 in the country (Tr. at 538).

The vocational expert testified that a person described in Dr. McGehee's August 21, 2006, medical source statement could not perform any work due to the finding that he could not work in coordination with others to complete a normal workday, accept instructions, get along with co-workers, or set plans or goals (Tr. at 533).

## V.   *FINDINGS OF THE ALJ*

Administrative Law Judge Linda Carter entered her opinion on February 9, 2007 (Tr. at 21-31).

The ALJ found that plaintiff was insured through September 30, 2005 (Tr. at 21, 23).

Step one.  Plaintiff has not engaged in substantial gainful employment since his alleged onset date (Tr. at 23).

Step two.  Plaintiff suffers from the severe impairments of affective mood disorder, generalized anxiety disorder, personality disorder not otherwise specified, monocular vision, and history of recurrent MRSA infection (Tr. at 2).  The ALJ found that plaintiff's alcoholism, in remission since 2004, is non-severe (Tr. at 24).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 25).

Plaintiff retains the residual functional capacity to perform work without impairment-related exertional limitations. He cannot perform tasks requiring depth perception, including commercial driving, and should work on an even surface, avoiding climbing to unprotected heights and avoiding potentially dangerous unguarded moving machinery.  Despite his psychological disorders, he can perform simple, repetitive (1,2,3 steps) tasks with minimal public contact and no public service.  He can tolerate the proximity of coworkers and supervisors, but cannot engage in team work.  Due to his recurrent infection, he cannot perform health care or food service (Tr. at 26).

Step four.  Plaintiff's past relevant work as a recycle, dining room attendant, cleaner, groundskeeper, asphalt plant

42

worker, laundry worker, and parts inventory clerk "is so sporadic that it is not clear that he performed substantial gainful activity in any of these occupations. . . . For the purpose of this decision only, it is found that the claimant has no past relevant work." (Tr. at 29).

Step five. There are other jobs that exist in significant numbers that plaintiff can perform, such as vehicle cleaner (with 3,800 jobs in the four-state region and 510,000 in the country), baggage porter (with 1,200 jobs in the region and 119,000 in the country), routing clerk (with 3,600 jobs in the region and 226,000 in the country), or scale operator (with 2,000 jobs in the region and 145,000 in the country) (Tr. at 29-30).

## VI. RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff argues that the ALJ erred in failing to indicate what evidence she relied on in formulating plaintiff's residual functional capacity. The ALJ indicated in her opinion that she gave great weight to the medical opinions of Dr. Lutz and Dr. Wilson but discounted the opinion of Dr. McGehee. All three doctors were consultative examiners. Plaintiff was not treated for a mental impairment prior to his last insured date, and his treating psychiatrist did not provide a medical source statement.

The substantial evidence in the record as a whole supports the ALJ's decision to discredit the opinion of Dr. McGehee. The

43

ALJ had this to say about Dr. McGehee:

> Psychologist Sharol McGehee, Psy.D., examined the claimant
> at the request of Missouri Division of Family Services on
> October 28, 2004, and recommended award of medical
> assistance. She again examined the claimant at the request
> of Missouri Division of Family Services on May 8, 2006, and
> recommended that his medical assistance eligibility
> continue. On August 21, 2006, she signed a Medical Source
> Statement - Mental in support of the claim for disability
> benefits. Dr. McGehee's opinion is given little weight in
> this decision. Her report to Missouri Division of Family
> Services in 2006 is virtually identical to her report in
> 2004, even to the identical GAF of 38, which strongly
> suggests that only a cursory examination was done in 2006.
> Dr. McGehee's opinion is greatly outweighed by the opinions
> of Drs. Lutz and Wilson, and the observations reported by
> the Burrell Center.

(Tr. at 28).

Dr. McGehee's reports, dated 2004 and 2006, are indeed

almost word for word the same. As mentioned above, both reports

even list plaintiff as being 43 years of age. Clearly the 2004

report was used in 2006 and the editing job was not very

accurate.

Much of Dr. McGehee's opinion relies on representations by

plaintiff who has not been consistent. For example, he told Dr.

McGehee during his 2004 exam that he had stopped drinking six

months earlier, but he told another doctor that he had continued

drinking through the summer of 2005, almost a year after his

first visit with Dr. McGehee when she believed he was no longer

using alcohol. In addition, plaintiff told Dr. McGehee that he

was hospitalized at the Marian Center after he "freaked out" but

44

was unable to give her any more explanation, and he told her he was at Cox Psychiatric Unit as well, but with no further information about why, what his diagnoses were, or what treatment he received.

Dr. McGehee did not consider whether her own test results were valid (the Mental Status Exam, the Michigan Alcohol Screening Test, and the Personality Assessment Screener). On March 14, 2004, Dr. Wilson noted that on the MMPI-2, plaintiff produced a profile indicating that he was exaggerating his mental problems.

Dr. McGehee noted in 2004 that plaintiff had a number of health problems and concerns that "may be directly related to the depressive symptoms"; however, she did not diagnose plaintiff with depression. In the 2006 report, she noted in the body of her report that plaintiff was "severely depressed"; but again, she diagnosed him with anxiety, not depression. She found that he showed a general disregard for authority; however, plaintiff had no difficulty with any doctor he ever saw, he reported that he got along fine with his teachers, and he even testified that he got along well with supervisors and had no problems when a supervisor would chastise him or watch him too closely.

Rather than relying on the opinion of Dr. McGehee which is not credible, the ALJ relied on the opinions of Dr. Lutz and Dr.

Case 6:07-cv-03305-REL   Document 15   Filed 01/20/09   Page 45 of 63

Wilson and the observations of plaintiff's treating psychiatrist and nurse at Burrell Behavioral Health. Dr. Lutz outlined the results of all of the tests he administered, then he found that plaintiff could understand and remember simple to complex instructions, was able to sustain concentration and persistence on simple to moderately complex tasks, could interact in moderately demanding social situations, and could adapt to his environment.

Dr. Burstin, a non-examining psychologist, found that plaintiff's mental impairment was not severe. He relied on the fact that plaintiff had sought no treatment, he continued to drink alcohol, and his testing with Dr. Lutz was essentially normal.

Dr. Wilson conducted several tests, one of which indicated plaintiff was exaggerating his mental problems. She found that plaintiff was capable of understanding and remembering simple to complex instructions, he could sustain concentration and persistence with simple to complex tasks, he that he would have no trouble interacting socially or adapting to his environment.

The following year, Dr. Burstin found that plaintiff could sustain simple tasks, interact in settings with limited public-contact demands, and adapt to moderately-complex environments. He found that plaintiff could acquire and retain moderately-

complex instructions and sustain concentration and persistence with moderately-complex tasks. He found plaintiff could relate adequately to others in settings without frequent public contact or unusually close interact, and that he could respond to changes in non-complex work environments.

Plaintiff did not seek any health care at all until October 25, 2005, years after his alleged onset date, a year after Dr. McGehee recommended he be approved for medical assistance, and a month after his last insured date. He did not seek mental health treatment until April 2006 -- more than four years after his alleged onset date, a year and a half after he was approved for medical assistance, and seven months after his last insured date.

Plaintiff's treating psychiatrist at Burrell observed that plaintiff presented no threat of becoming violent; he was cooperative and open; his speech was normal; thought processes were normal; he had no distortions, delusions, or hallucinations; he was oriented times four; and his memory was fine. His mental status exam was within normal limits. Dr. Jarvis told plaintiff he needed to make a plan each day and try to get out, although plaintiff failed to follow through with that advice.

Marilyn Corson, a nurse at Burrell, observed that plaintiff was alert and oriented with good grooming and good eye contact; speech was normal; and he had adequate insight and judgment. She

47

reminded plaintiff that setting goals, getting out of the house, and becoming more active would help him conquer his anxiety and relieve his depression.

The ALJ did not simply adopt any opinion by any particular doctor. Instead, she gave plaintiff the benefit of any doubt and found that his residual functional capacity was more restrictive than anything found by the doctors on whose opinions she relied. The ALJ found that plaintiff could perform simple, repetitive (i.e., three-step) tasks with minimal public contact and no public service, and that he could tolerate the proximity of coworkers and supervisors, but could not engage in team work. The opinions of Dr. Lutz, Dr. Burstin, Dr. Wilson, Dr. Jarvis, Dr. Neal, and Ms. Carson all include the ability to handle more complex tasks and more work with others.

I find that the substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

## VII. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible because the ALJ ignored plaintiff's reports of pain from his boils and problems with his good eye.

48

## A.   CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and

49

examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant testified he experiences difficulty with eye contact, rarely uses a telephone, and left his last job because he was overwhelmed by his symptoms. He is blind in one eye, and experiences intermittent fogginess and blurring in the good eye. In addition, the claimant testified he is unable to lift and carry heavy objects or to stand or sit for prolonged periods of time due to the discomfort from boils.
>
> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the

intensity, persistence and limiting effects of these
symptoms are not entirely credible.

Although the claimant testified that he had gone to an
emergency room three times for relief of pain, no medical
evidence of these visits has been brought forth.  Further,
his treating physician has described the boils as largely
resolved and only "occasional".

The claimant's allegation of impaired vision in his better
eye was tested by eye surgeon Judd McNaughton, M.D., who
found no sign of the alleged deficits.

The weight of the medical evidence also does not support his
allegation of a disabling mental disorder.  Psychologist
David Lutz, Ph.D., who examined the claimant at the request
of the Disability Determinations Service on May 8, 2003,
opined that he could meet the usual demands of unskilled
work.  Psychologist Eva Wilson, Psy.D., examined the
claimant at the request of the Disability Determinations
Service on March 17, 2004, and, despite somewhat different
diagnoses, reached the same conclusion.

The claimant did not enter into psychotherapy until April
2006, more than four years after his impairments allegedly
became disabling.  He was treated at the Burrell Center from
April to September 2006.  He described himself as depressed
and isolated.  Medication was prescribed, and the claimant
was advised to walk for exercise and to seek social contact.
He did not follow the recommendations for exercise and
social contact, and discontinued therapy on September 12,
2006.  He returned to Burrell on December 7, 2006, to allege
increased symptoms.  This last visit, which took place only
two weeks before the hearing in this matter, appears to have
been an effort to bolster his claim for disability.

Psychologist Sharol McGehee, Psy.D., examined the claimant
at the request of Missouri Division of Family Services on
October 28, 2004, and recommended award of medical
assistance.  She again examined the claimant at the request
of Missouri Division of Family Services on May 8, 2006, and
recommended that his medical assistance eligibility
continue.  On August 21, 2006, she signed a Medical Source
Statement - Mental in support of the claim for disability
benefits.  Dr. McGehee's opinion is given little weight in
this decision.  Her report to Missouri Division of Family

51

Services in 2006 is virtually identical to her report in
2004, even to the identical GAF of 38, which strongly
suggests that only a cursory examination was done in 2006.
Dr. McGehee's opinion is greatly outweighed by the opinions
of Drs. Lutz and Wilson, and the observations reported by
the Burrell Center.

The Administrative Law Judge has examined the claimant's
work record and notes the claimant has a somewhat sporadic
work history with no substantial earnings in many years even
before the alleged onset of disability.  The claimant's work
record draws into question the claimant's motivation to work
and his credibility as a witness herein.

(Tr. at 27-28).

The ALJ discussed plaintiff's work history; the duration,
frequency, and intensity of symptoms; and the medical evidence.
Although the ALJ did not thoroughly discuss the other Polaski
factors, the substantial evidence in the record as a whole
supports her credibility conclusion.

## 1.   *PRIOR WORK RECORD*

As the ALJ noted, plaintiff had a sporadic work history with
no substantial earnings many years before his alleged onset date.
In addition, plaintiff testified that he liked his job doing
temporary assignments, he does not ever remember having problems
with his supervisors or co-workers, and he did not have to deal
with other people in his job washing trash cans.  These jobs he
has performed did not present problems for him with respect to
the symptoms he alleges from his impairments.

52

## 2.  *DAILY ACTIVITIES*

Plaintiff reported that he is able to do household repairs and mow the yard.  When asked why he does not do housework or yard work, plaintiff wrote, "N/A", leading to the conclusion that he chooses not to perform these tasks for some reason other than his impairments.  He is able to leave his house to go to the lawyer, Family Services, Social Security, or to shop for groceries.  He is able to use public transportation, and in fact he has not even checked into getting a drivers license because the public transportation system serves him well.  This indicates that plaintiff does not have problems being around other people in order to travel to and from his appointments and to run errands.  Plaintiff testified that he takes naps for up to two hours per day; however, he never complained to his doctors about an inability to stay awake during the day and no doctor has ever recommended that plaintiff take naps.  In fact, his treating doctors have repeatedly told him to become more active during the day in order to improve his symptoms.

## 3.  *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

*a.  Lower back pain.*  Plaintiff never complained of back pain until October 25, 2005 -- almost a month after his last insured date.  He was never prescribed anything other than

53

stretching exercises and over-the-counter pain medications for his back pain.

***b. MRSA infection.*** Although plaintiff claims his boils are disabling, the first time he presented with a boil was on January 24, 2006 -- four months after his last insured date (September 30, 2005). On that first visit, the record says plaintiff complained of "occasional boils" and Dr. Hankins observed "a few small scabs." He did not return to see Dr. Hankins again until July 3, 2006 -- more than five months later. Although there is a reference in this medical record to a visit to the ER due to MRSA infection, there are no records establishing that plaintiff did go to the emergency room. Dr. Hankins observed only a "small scabbed area". She gave plaintiff a topical antiseptic and a topical antibiotic. Plaintiff did not see Dr. Hankins again for the rest of that year.

***c. Depression.*** The record establishes that plaintiff's depression was not as severe as he alleges. In his administrative paperwork, plaintiff was asked how he handles stress, and he indicated "not well" because he bites his fingernails.

On May 8, 2003, he was responsive and cooperative and had no obvious difficulties during the mental examination. On March 16, 2004, he was pleasant, cooperative, and in no distress. On March

17, 2004, he was very pleasant and cooperative and exhibited no unusual mannerisms.  He appeared to be in a happy mood and showed no signs of depression or anxiety.  On October 28, 2004, plaintiff was cooperative and related well to the examiner.

Plaintiff consistently denied delusions and hallucinations when talking to doctors; however, he claimed he saw shadows and heard voices when he saw a nurse on May 23, 2006 (while he was waiting for his administrative hearing) and he told the nurse on August 6, 2006, that the fan talks to him (he was still awaiting his hearing).  He denied hallucinations or delusions on May 8, 2003, to Dr. Lutz; on October 28, 2004, to Dr. McGehee; and on April 10, 2006, to Dr. Jarvis.  Interestingly, he reported to the nurse on May 23, 2006, the he was seeing shadows and hearing voices, and this was only about six weeks after he had denied these symptoms to Dr. Jarvis.  Plaintiff saw Dr. Jarvis again only one week after he reported these symptoms to the nurse, but he failed to mention them to the doctor that day or on September 12, 2006 when he again saw the psychiatrist.

On March 17, 2004, while meeting with Dr. Wilson, plaintiff denied suicidal thoughts.  On April 10, 2006, plaintiff denied suicidal thoughts to his treating psychiatrist, Dr. Jarvis.  Dr. Jarvis found that plaintiff presented no threat of becoming violent.  Less than a month later, on May 8, 2006, plaintiff met

with Dr. McGehee in connection with his medical assistance application, and he admitted to suicidal ideation. Plaintiff did not mention suicidal thoughts during any meeting with his treating psychiatrist. Suicidal thoughts were not mentioned again until December 7, 2006 -- two weeks before his administrative hearing -- when he told a nurse that he had considered which rib to penetrate with a knife. He was reminded to call the crisis hotline if his thoughts became overwhelming, but there is no evidence he ever used the crisis hotline.

On May 13, 2003, Dr. Burstin found that plaintiff's mental impairment was not severe. On October 28, 2004, Dr. McGehee observed that plaintiff appeared to be experiencing a severely anxious and depressed mood; however, she did not diagnose plaintiff with depression. On October 25, 2005, Dr. Hankins observed that plaintiff's behavior and affect were appropriate. On March 16, 2004, plaintiff told Dr. Paff that he was sad but that he does not cry.

**d.  *Eye impairment.*** Plaintiff testified that he experiences blurriness and foggy vision in his one good eye. This apparently does not stop him from watching ten hours of television every day. He testified that his vision problems did not interfere with his ability to drive. Plaintiff has never mentioned these eye problems to any treating physician, nor has

56

he ever been late for appointments due to vision problems. Dr. McNaughton confirmed the existence of floaters, but indicated they "may cause very brief blurriness when they cross the visual axis."

## 4. *PRECIPITATING AND AGGRAVATING FACTORS*

There is very little evidence of precipitating and aggravating factors. In a 2003 report, Dr. Lutz noted that plaintiff minimized the effects of his alcohol usage, which indicates that perhaps plaintiff's alcoholism was causing some of his symptoms but he refused to acknowledge that. However, because plaintiff has alleged that he stopped drinking prior to the administrative hearing, his alcohol use is not really relevant. In fact, the ALJ found plaintiff's alcoholism non-severe and plaintiff does not object to that finding.

## 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

Plaintiff testified during the administrative hearing that he does not suffer any adverse side effects from his medication.

**a.** *Back pain.* Plaintiff alleged lower back pain; however, all of his tests were normal and he has never been prescribed anything stronger than over-the-counter Tylenol or Ibuprofen.

**b.** *MRSA infection.* Plaintiff was prescribed a topical antiseptic for his boils; however, he testified that he did not use it. In fact, he was able to maintain adequate hygiene for

57

years after his alleged onset date but claims that he stopped bathing daily only after his doctor prescribed a certain soap and antiseptic to treat his boils. Plaintiff was never observed with anything but appropriate personal hygiene, even 14 days before he testified that he no longer bathed daily: May 8, 2003 (dressed appropriately, hygiene adequate), March 17, 2004 (hygiene adequate), October 28, 2004 (neat and clean in appearance, adequate personal hygiene), April 10, 2006 (casually dressed, fair hygiene), May 23, 2006 (clean and neatly dressed), December 7, 2006 (good hygiene). It is simply not credible that plaintiff's depression caused him to stop bathing. In fact, if he showed up unbathed at the hearing, it would appear to have been staged since he was observed with "good hygiene" only two weeks earlier.

   *c.   Depression.*   Plaintiff was not on any medication at all for depression or anxiety until May 23, 2006 (about eight months after his last insured date). On his second visit a little over two months later, his antidepressant was increased and he was prescribed an antipsychotic. Although he was told to call if he had any problems, plaintiff failed to report that the antipsychotic made him excessively drowsy. Instead, he did not refill it after the first month. Because plaintiff was prescribed this medication on August 8, 2006, and told his doctor

on September 12, 2006, that he stopped taking it after the first
month, he actually had only been without it for four to five days
at the most.  The doctor prescribed a different kind of
antidepressant and plaintiff was never again put on an
antipsychotic.

Plaintiff's mental health treatment has not been very
intense.  He first saw a psychiatrist on April 10, 2006.  He saw
a nurse on May 23, 2006; a psychiatrist on May 31, 2006; a nurse
on August 8, 2006; a psychiatrist on September 12, 2006; and a
nurse on December 7, 2006 -- three psychiatrist visits and three
nurse visits in the entire record, and all of these visits were
after plaintiff's last insured date.[11]  Plaintiff did not
participate in counseling, he was prescribed an antidepressant
and also took an antipsychotic for one month, he was never
hospitalized, he never called the crisis hotline that was
available through Burrell Behavioral Health.

## 6. *FUNCTIONAL RESTRICTIONS*

On May 8, 2003, Dr. Lutz found that plaintiff seemed able to
understand and remember simple and complex instructions; sustain
concentration and persistence on simple and moderately complex

---

[11]Although there was no testimony about plaintiff's lack of
medical care, Dr. McGehee recommended in October 2004 that
plaintiff be awarded medical assistance, yet he did not seek
medical treatment for any impairment until sometime in 2006.

tasks, and probably complex tasks; interact in moderately demanding social situations; and adapt to his environment. On March 16, 2004, Dr. Paff found that plaintiff likely experiences some fatigue, depression, and loss of vision in his right eye, but he is not disabled. On March 17, 2004, Dr. Wilson found that plaintiff was capable of understanding and remembering simple, semi-complex, and complex instructions; he could sustain concentration and persistence with simple, semi-complex, and complex tasks; and he would have no trouble interacting socially or adapting to his environment. On November 22, 2004, Dr. McNaughton found that plaintiff had no visual limitations in reading, the ability to work on a computer, or the ability to work under fluorescent lights, nor would he need rest periods for his eyes after performing these activities. On April 19, 2005, Dr. Burstin found that plaintiff had moderate restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace with complex tasks.

**B.    *CREDIBILITY CONCLUSION***

In addition to the above factors which support the ALJ's finding, I note many other instances in the record which call into question plaintiff's credibility. In a Disability Report, plaintiff reported that he first became unable to work due to

60

deep depression and a blind right eye on August 30, 2002, even though his alleged onset date was January 1, 2002. In his administrative paperwork, plaintiff alleged that his impairments adversely affect his ability to lift, squat, bend, stand, reach, walk, climb stairs, see, remember, concentrate, and get along with others. However there is no support at all for an impaired ability to lift, squat, bend, stand, reach, walk, climb stairs, remember, or concentrate. All of plaintiff's mental testing showed no memory impairment. Interestingly, plaintiff told Dr. Lutz that he generally got along well with supervisors and coworkers on his different jobs.

Plaintiff was inconsistent when he reported how long he had been incarcerated for DWI convictions. He told Dr. Lutz on May 8, 2003, that he was locked up for two years; he told Dr. Wilson on March 17, 2004, he did two years; he told Dr. McGehee on October 28, 2004, it was 11 months; he told Dr. Jarvis on April 10, 2006, he spent only nine months in jail; and he told the nurse on May 23, 2006, that he was in jail for one year.

Plaintiff has been inconsistent in his reports of what drugs he has used in the past: on May 8, 2003, he told Dr. Lutz he had used marijuana and amphetamines; on March 16, 2004, he told Dr. Paff he had used marijuana and no other drugs; on October 28, 2004, he told Dr. McGehee he had used only marijuana; and on

April 10, 2006, he denied using any drugs to Dr. Jarvis.

Plaintiff has been inconsistent in his reports of his last use of drugs: on May 8, 2003, he told Dr. Lutz his last use was 20 years ago (or 1983); on March 16, 2004, he told Dr. Paff he last used drugs five years ago (or 2001); on March 17, 2004, he told Dr. Wilson he last used drugs five years ago (or 2001); on October 28, 2004, he told Dr. McGehee he last used drugs two years ago (or October 2002); and on May 23, 2006, he told a nurse that he used drugs until 2001.

Plaintiff has been inconsistent in his reports of his last use of alcohol: On October 28, 2004, he told Dr. McGehee he had stopped drinking on April 6, 2004; on October 25, 2005, he told Dr. Hankins he quit in July 2005; on April 10, 2006, he told Dr. Jarvis he stopped drinking three years earlier (or April 2003); and on May 23, 2006, he told the nurse he had stopped drinking "two or three years ago" which would have been May of 2003 or 2004.

On March 17, 2004, Dr. Wilson noted that plaintiff produced a profile indicating that he was exaggerating his mental problems. Plaintiff testified that he suffers from panic attacks, problems with his hands swelling up and his palms itching and turning a blotchy red, and severe pain in his shins; however, he has never mentioned these symptoms to any doctor or

62

nurse.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disability are not entirely credible.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
January 20, 2009